UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
PIKEVILLE

AMY JO HICKS,                          )
                                       )
        Plaintiff,                     )
                                       )          Civil No. 16-154-ART
v.                                     )
                                       )
CAROLYN W. COLVIN, *Acting*            )       **MEMORANDUM OPINION**
*Commissioner of Social Security*,     )          **AND ORDER**
                                       )
        Defendant.                     )
                                       )

\*\*\*   \*\*\*   \*\*\*   \*\*\*

If the government threw Amy Jo Hicks in jail because she was a member of Al Qaeda, she would get a chance to challenge that factual assertion before a neutral arbiter. *See Hamdi v. Rumsfeld*, 542 U.S. 507, 533 (2004). If the government fired her because she lied on an employment form, she would get a chance to challenge that factual assertion before a neutral arbiter. *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 544 (1985). And if the government took away her stove because she was late on her installment payments, she would get a chance to challenge that factual assertion before a neutral arbiter. *See Fuentes v. Shevin*, 407 U.S. 67, 82–84 (1972). But when the government redetermined her right to disability payments—and categorically excluded some of her medical evidence because it had "reason to believe" the evidence was fraudulent—she never got a chance to challenge that factual assertion before anyone.

The question here is whether that redetermination process violated the Due Process Clause. It did. The Due Process Clause ensures that people receive meaningful hearings.

And meaningful hearings give people the opportunity to challenge the government's factual assertions—at least where, as here, those assertions affect their rights.

The Court must therefore remand this case so that the SSA can give Hicks adequate process. That process need not involve a whole new mini-trial. The SSA must simply give Hicks the opportunity to challenge the basis for excluding evidence she wishes to present. That additional safeguard does not place an onerous burden on the SSA, and is necessary to assure that people do not lose their entitlements because of decisions made in the dark.

I.

A.

Back in September 2007, Hicks suffered from headaches, depression, and anxiety, as well as injuries to her right arm, neck, back, head, legs, and hips. R. 1 ¶ 4. She applied to the SSA for disability benefits, and, after testifying at an administrative hearing, received those benefits. *Id.* ¶ 5. The lawyer who helped prepare her application was "Mr. Social Security" himself, Eric C. Conn,[1] who secured benefits for thousands of others as well. *See* R. 10 at 5.

As plenty of coaches have said in plenty of halftime speeches, however, it's not what you do that matters, but how you do it. How Conn got his clients their benefits was, allegedly, by fraud. For years, the government says, Conn orchestrated a social-security scam that involved himself, an administrative law judge (ALJ) named David Daugherty, and four doctors. R. 25 at 3–4. When a client would walk into Conn's office, Conn would have a template medical form waiting. *Id.* at 4. Conn completed the form himself and sent it off

---

[1] *See* The Conn Law Firm, http://www.mrsocialsecurity.com/.

2

to one of the doctors, who would sign it allegedly without examining the client at all.  *Id.*
Conn would then request an administrative hearing.  *Id.*  Daugherty would assign the case to
himself, accept the false medical records into evidence, quickly award benefits, and collect a
kickback from Conn.  *Id.*

At some point, the SSA's Office of the Inspector General (OIG) began investigating.
By July 2014, the OIG discovered that at least 1,787 people—all former Conn clients—had
submitted a template medical form sometime between 2007 and 2011.  *Id.* at 18.

B.

That discovery jumpstarted an interlocking series of statutes and regulations called
the redetermination process.  Under one part of the Social Security Act, "[a]s soon as the
[OIG] has reason to believe that fraud was involved" in a benefits application, it "shall" refer
that information to the SSA.  42 U.S.C. § 1320a-8(l).  When the OIG says such things, the
SSA listens.  Indeed, it has to:  Under another part of the Act, the SSA "shall immediately
redetermine" a person's entitlement to benefits "if there is reason to believe that fraud was
involved" in that person's application.  42 U.S.C. § 405(u)(1)(A).  Further, the SSA "shall
disregard any evidence" during the redetermination process "if there is reason to believe that
fraud . . . was involved in the providing of such evidence."  *Id.* § 405(u)(1)(B).  In somewhat
plainer English:  When the OIG discovers fraud in an application, it must alert the SSA; the
SSA must then redetermine whether the applicant actually deserved benefits at the time she
applied for them; and in doing so, the SSA may not consider any part of the application that
contains the suspected fraud.

3

As usual, the statute leaves something to the agency's imagination—such as how, exactly, to make the process work.  In the *Social Security Administration Hearings, Appeals, and Litigation Law Manual* ("HALLEX," for short), the SSA has filled in those gaps.  *See* HALLEX § I-1-3-25;[2] *see also* Policy Interpretation Ruling, 81 Fed. Reg. 13436 (Mar. 14, 2016) (providing public notice of the SSA's interpretation of the redetermination statutes).  The HALLEX manual is an internal-guidance document laying out the procedures that the SSA follows when it must redetermine someone's entitlement to social-security benefits.  The SSA "will offer the opportunity for a hearing" before cancelling a person's benefits.  *Id.* § I-1-3-25(C)(5) (citing *Goldberg v. Kelly*, 397 U.S. 254 (1970)).  The SSA will even help that person develop new evidence, should she need it to prove that she deserved her benefits at the time she applied for them.  *Id.* § I-1-3-25(C)(4)(b).

The SSA will not, however, look at any part of the person's original application that the OIG has said contains fraud.  At redetermination hearings, ALJs "do not have discretion to reconsider" whether to disregard evidence the OIG has identified.  *Id.* § I-1-3-25(C)(4)(a).  According to the SSA's internal regulations, ALJs must simply pretend that the evidence no longer exists.  Nor can a beneficiary appeal the SSA's decision to disregard evidence when the OIG was the one to flag that evidence as fraudulent.  *Id.* § I-1-3-25(C)(6).  The OIG's word is, effectively, gospel.

## C.

Conn's alleged scheme was just what Congress built the redetermination process to address.  As required by Section 1320a-8(l), the OIG sent the SSA a referral letter identifying

---

[2] *Available at* https://www.ssa.gov/OP_Home/hallex/I-01/I-1-3-25.html.

1,787 applications that bore the mark of Conn.  R. 25-1 at 5.  With "reason to believe that fraud was involved in th[ose] applications," the OIG saw no "objections to SSA moving forward" with the redetermination process.  *Id.*  So, as required by Section 405(u)(1)(A), the SSA moved forward:  After getting word from the OIG, the SSA had no choice but to give 1,787 old applications another look.  R. 25 at 16.  But, as required by its own regulations, the SSA looked past the template medical forms and any other evidence that Conn's doctors had submitted on the applicants' behalves.  HALLEX § I-1-3-25(C)(4)(b).

Facing the possibility that it was funding so many undeserving beneficiaries, the SSA worked quickly.[3]  Flipping through the old applications, the SSA picked out those that, after "disregarding the suspect evidence identified by the OIG," did not have sufficient evidence to support their claims.  R. 25 at 9.  That group turned out to include 86% of the applications that the OIG had identified, or about 1,500 people.  *Id.* at 9 n.4.  Then—less than a week after the OIG had said that it could move forward—the SSA notified about 1,500 people that an ALJ would redetermine their entitlements.  *Id.* at 9; *see also* R. 1-1.

Hicks was one of those people.  Her redetermination hearing took place on February 1, 2016.  *See* R. 1 ¶ 9.  "The relevant period for this hearing," the ALJ explained at the outset, "is from September 1, 2007, through July 2, 2008," the period when Hicks had applied for benefits.  *See* Certified Administrative Record at 34.  All evidence, old and new, had to pertain to that period; the ALJ was interested in the past.  But he was not interested in one specific part of it—any evidence that Hicks had submitted from Conn's doctors.  *Id.* at

---

[3] More quickly, in fact, than the government worked to prosecute Eric Conn.  It got around to that about a year later.  *See United States v. Conn*, No. 5:16-cr-22-DCR, D.E. 1 (E.D. Ky. Apr. 1, 2016) (indictment).

30 ("[W]e exclude evidence from certain doctors during the relevant period. I'll issue a new decision based on the remaining evidence.").

So Hicks once again found herself in an administrative hearing, testifying about the state of her health in 2007. But this time, she was not testifying *in* 2007—she was testifying *about* 2007 from almost ten years in the future. According to Hicks, this was no easy task. Like many of Conn's clients, she had been found disabled in the first place because of her "mental deficits and illnesses," which "hamper[ed] [her] ability to recall accurately [her] medical histor[y]." R. 22 at 20. Nor was hard evidence easy to come by. What evidence she had she apparently gave to Conn, who has since "los[t]" or "destroy[ed]" it. *Id*. Plus, if any remained, it would have done her little good. Hicks said at oral argument, for example, that she had undergone psychological testing in 2007. The only problem was that one of Conn's doctors had run the test. As the ALJ instructed, while Hicks told her story the second time, she had to leave any visits with, statements by, or evidence from Conn's doctors out of it. And so, with a bad memory and little evidence, Hicks attempted to recall specific medical facts from nearly ten years before. *See, e.g.*, Certified Administrative Record at 45, 48.

After the hearing, the ALJ concluded that Hicks did not have enough evidence to support her initial benefits claim. *Id*. at 10–22. So the SSA cancelled her benefits. *See* R. 1 ¶ 9. Hicks appealed, but the SSA declined to review the ALJ's decision. *Id*. ¶ 9. That decision is, therefore, final, and Hicks no longer receives disability payments.

### D.

By now, the SSA has held about 1,400 redetermination hearings for Conn's former clients. R. 25 at 10. About half have kept their benefits, and about half have lost them. *Id*.

6

Many in the second half—including Hicks—have now sued the SSA in this Court and others. They argue that, procedurally, the redetermination process violated the Administrative Procedure Act, the Social Security Act, and the Fifth Amendment Due Process Clause. They also argue that, substantively, the ALJs' decisions were not supported by enough evidence. *See* R. 1 ¶ 11–20. The SSA moved to dismiss the procedural claims. R. 10.

The Court isolated the due-process claim for review because, above all else, agencies must follow the Constitution. R. 18 at 2. Because the claim depends largely on questions of law, which can be resolved through briefing and argument, the parties agreed to cross-move for summary judgment on the due-process claim. *Id*. The parties submitted their motions— plus some supplemental briefing—and the Court held a consolidated oral argument. With the briefs in and the argument over, the due-process question is now before the Court.

## II.

### A.

The parties agree on some basics. Due process has always required an "opportunity to be heard." *Grannis v. Ordean*, 234 U.S. 385, 394 (1914). Since the 1970s, due process has specifically required that, when terminating someone's social-security benefits, the SSA give that person some kind of hearing. *See Mathews v. Eldridge*, 424 U.S. 319, 343 (1976) (citing Henry J. Friendly, *Some Kind of Hearing*, 123 U. Pa. L. Rev. 1267, 1281 (1975)). The SSA gave Hicks a hearing. And, it argues, that was enough. There the parties diverge.

The wisdom of the halftime speech—not to mention the Due Process Clause—applies to the government, too. It's not always what the government does that matters, but how. Whatever kind of hearing an agency might provide, that hearing must be "meaningful."

*Armstrong v. Manzo*, 380 U.S. 545, 552 (1965).  Of course, what is meaningful to one person might seem meaningless to another.  Thus, "how much process is due" is, largely, relative. *Shoemaker v. City of Howell*, 795 F.3d 553, 559 (6th Cir. 2015).

But there is at least one absolute.  Even if no two hearings are alike, all meaningful hearings provide "a fair opportunity to rebut the [g]overnment's factual assertions before a neutral decisionmaker."  *Hamdi*, 542 U.S. at 533.  Granted, not all assertions are fair game. The sky is blue.  There are *x* number of certain jobs available nationwide.  Those types of "general factual issues" are "not unique to each claimant."  *Heckler v. Campbell*, 461 U.S. 458, 468 (1983).  Such assertions are not about anyone in particular.  They do not, standing alone, affect anyone's rights.  No one's unique evidence would change the agency's mind about whether the sky is blue or there are a certain amount of jobs available nationwide. Thus, an agency can determine such facts without allowing a claimant to tender a challenge; such challenges would merely waste time.  *Id*.

But as the fact at issue gets more specific, the process gets more involved.  When the government asserts a fact *about* someone and that affects her rights, due process provides her a chance to challenge the assertion.  The logic is easy enough.  Imagine contesting a speeding ticket.  You got the ticket on I-75.  But that day, every inch of the road within county lines was under construction—thus, the fine for anyone speeding on that road, on that day, will be doubled.  That decision rests on a general, sky-is-blue type of fact: there was construction. Because the fact has nothing to do with you in particular, your hearing will not be any more or less meaningful whether or not you get the chance to challenge it.

But now imagine that you had skipped school and were driving your father's 1961 Ferrari GT California. And the judge tells you not even to bother arguing about speed— she's seen enough to know for a fact that anyone who skips school to drive their father's Ferrari always goes ten miles over the speed limit, and, thus, that *you* were driving ten miles over the limit when you got the ticket. That assertion is about you. It affects your rights. And you very well might have unique evidence to debunk it. Anyone would say that you got some kind of a hearing. But absent any chance to challenge the judge's speed assertion, no one would say that you got a very meaningful one.

Although logic alone would suffice, cases are useful, too. Below is a non-exhaustive list of controlling precedent, which illustrates this core element of due process. Consider it a Brief Tour of "Meaningful Hearings" Through the Years.

First up is *Interstate Commerce Commission v. Louisville & Nashville Railroad Co.*, 227 U.S. 88 (1913). There, the Commission gave a hearing, but then found the railroad's rates unreasonable, apparently without considering any of the evidence that the parties had presented. *Id.* at 90. The government argued that it had satisfied due process simply by giving a hearing. After the hearing, it said, an agency could find any fact it wanted, no matter the evidence. *Id.* at 91. The Supreme Court disagreed. The "right to a full hearing," the Court wrote, means the right to present facts and to have the case decided according to those facts. *Id.* The government's proposal would empower agencies to "capriciously make findings by administrative fiat," making the hearing meaningless. *Id.* When "rights depend[] upon facts," parties must have a chance to say—and be heard on—what those facts are. *Id.*

That principle shows up again in *Greene v. McElroy*, 360 U.S. 474 (1959).  There, the Department of Defense fired Greene based on confidential reports that he was a Communist agent.  *Id*. at 478.  Again, the agency held a hearing, though it never let Greene see the reports.  And again, the government argued that the hearing was enough.  *Id*. at 492–93.  But again, the Supreme Court disagreed.  "[W]here governmental action seriously injures" somebody, and "the action depends on fact findings," that person must have "an opportunity to show that [those findings are] untrue."  *Id*. at 496.  "Certain principles," the Court wrote, "have remained relatively immutable in our jurisprudence."  This is one.  *Id*.

Later, in *Goldberg v. Kelly*, the New York state social services agency ended the plaintiff's welfare benefits without any hearing at all.  397 U.S. at 268.  In a decision taught to every first-year law student since, the Court required the state to give its welfare recipients a "pre-termination hearing."  *Id*. at 266–67.  For the most part, the Court left the states alone to work out the specifics of this new procedural right.  But one feature stayed "immutable": the hearing must be "meaningful."  *Id*. at 267 (quoting *Armstrong*, 380 U.S. at 552).  And meaningfulness still meant that "where important decisions turn on questions of fact," people must have "an opportunity to confront" the government's view of the facts.  *Id*. at 269–70 (quoting *Greene*, 360 U.S. at 496–97).

In *Mathews v. Eldridge*, the Court dealt with a state that seemed, at first glance, contrary to *Goldberg*.  424 U.S. at 316.  Whereas *Goldberg* required states to give their welfare recipients a hearing before terminating benefits, West Virginia gave its disability recipients a hearing only after termination.  *Id*. at 324–25.  But, the Court explained, welfare and disability are different.  Welfare depends on financial need, which many people (indigent

10

people especially) can only establish though in-person testimony.  *Id.* at 343–44 (quoting *Goldberg*, 397 U.S. at 269).  Disability, by contrast, depends on a medical fact—whether the recipient is disabled—that an agency can reliably determine without the benefit of a hearing.  *Id.*  Under the circumstances, then, the West Virginia process worked just fine.  But it worked, the Court emphasized, because it kept one important feature intact.  After termination, disabled West Virginians still received a "meaningful opportunity to present their case," *id.* at 349, which included an opportunity "to challenge directly the accuracy of [the] information" on which the agency had relied, *id.* at 349.  The timing of the hearing may have changed, but the quality of the hearing remained the same.

*Greene*, *Goldberg*, and *Mathews* are the tour's main attractions—all later cases apply, and must apply, the due-process principles that those three laid down.  For example, in *Vlandis v. Kline*, 412 U.S. 441 (1973), the Court held that a state university cannot continue to charge nonresident students higher tuition throughout their attendance based on an "irrebuttable presumption" that they will remain nonresidents, because "that presumption is not necessarily or universally true."  *Id.* at 452.  Due process, therefore, "require[s] that the state allow" a student "to present evidence showing that he is a bona fide resident."  *Id.  But see Campbell*, 461 U.S. at 467–68 (permitting such a presumption where the assertion is universally true).  Then in *Califano v. Yamasaki*, 442 U.S. 682 (1979), the Court held that when the SSA seeks to recover overpayments, recipients are entitled to challenge whether they were at "fault" for those overpayments.  Fault is "inherently subject to factual determinations and adversarial input."  *Id.* at 696–97.  And in *Cleveland Board of Education v. Loudermill*, the Court held that when a school district believes its employees have lied on

11

their employment forms, it still must give them a hearing before firing them.  470 U.S. at 532.  Dishonesty is an "arguable issue," and employees deserved an opportunity to tell their sides of the story.  *Id*. at 544.  In sum, when rights to education, benefits, and employment depend on facts, due process guarantees that students, beneficiaries, and state employees have a chance to discuss those facts.

Which brings the tour to its final stop: *Hamdi v. Rumsfeld*.  The government detained Yaser Hamdi—without a hearing—on the ground that he was an enemy combatant affiliated with the Taliban.  542 U.S. at 507.  The "sole evidentiary support" for that ground was the declaration of a government agent named Michael Mobbs (called the "Mobbs Declaration").  *Id*. at 512.  The government argued that any "further factual exploration [wa]s unwarranted."  *Id*. at 527.  As the government saw things, "a court [sh]ould assume the accuracy of the [g]overnment's" facts and assess "only" whether those facts justified detaining someone.  *Id*. at 527–28.  The Supreme Court disagreed.  Like students, beneficiaries, and state employees, U.S. citizen-detainees "must receive" a "fair opportunity to rebut the [g]overnment's factual assertions before a neutral decisionmaker."  *Id*. at 533.

The parties have filed extra briefs specifically addressing how *Hamdi* applies to the present case.  The SSA argues, mainly, that *Hamdi* is "fundamentally different."  R. 30 at 3.  True enough—*all* of the above cases have their differences.  In some, the stakes were higher than in others.  *See Hamdi*, 542 U.S. at 507 ("Hamdi's . . . is the most elemental of liberty interests—the interest in being free from physical detention[.]").  In others, the hearing must occur earlier than in some.  *Compare Goldberg*, 397 U.S. at 269, *with Mathews*, 424 U.S. at 343–44.  But they all have this principle in common:  When the government asserts a fact,

and when that fact affects someone's right to life, liberty, or property, due process requires the government to let that person speak for himself. Otherwise, the Supreme Court will strike the process down. *See, e.g.*, *Greene*, 360 U.S. at 496; *Goldberg*, 397 U.S. at 269–70; *Mathews*, 424 U.S. at 347; *Vlandis*, 412 U.S. at 452; *Yamasaki*, 442 U.S. at 396–97; *Loudermill*, 470 U.S. at 544; *Hamdi*, 542 U.S. at 533. That principle is all the Court relies on *Hamdi* for here. A hearing is not meaningful without a chance "to rebut the [g]overnment's factual assertions before a neutral decisionmaker." *Hamdi*, 542 U.S. at 533. Because of that principle, one feature remained notably absent from the above tour: any Star Chambers.

At the core of the present case, then, is a question about what the government can and cannot do without process. One thing it cannot do, according to *Hamdi* and its predecessors, is make a decision about you, not explain its reasons, and not let you challenge the decision. But here, that is exactly what the government did. The OIG made an assertion: "there [wa]s reason to believe fraud or similar fault was involved in [Hick's] application for benefits." R. 1-1 at 1. Given the SSA's internal regulations, nobody—not Hicks, not the ALJ, not the SSA's appeals board—could question the assertion. So the assertion became as good as fact. Because of that supposed fact, the SSA excluded Hick's main source of medical evidence. And because it did, Hicks lost her benefits. She was unable to re-develop enough evidence, almost ten years after the fact, to re-prove her entitlement. Thus, the government has made an "important decision[]" (to cancel Hicks's benefits), which "turned on a question of fact" (that Hick's medical evidence is fraudulent and therefore invisible), without giving her an "opportunity to confront" its view of the facts. *Goldberg*, 397 U.S. at 269–70 (quoting *Greene*, 360 U.S. at 496–97). That was some kind of process. Just not a meaningful kind.

13

Nevertheless, one might be inclined to ask: So what? The point of a redetermination hearing is not to find out whether certain evidence really was fraudulent. The point is to find out whether someone really deserves her benefits. Since Hicks got to present evidence about the ultimate fact, why should she get to challenge an ancillary fact (the fraud assertion), too? Because, under the circumstances, that fact was not ancillary—her rights depended upon it. The information in Conn's medical report was, clearly, material to the SSA's determination. When the SSA considered that report, Hicks won social-security benefits; when it did not, she lost them. Moreover, although Conn might have used a healthy dose of fraud to produce the form, the form might still have held information—like the narrative account of Hicks's visit(s) with Conn and/or his doctors—that was not, itself, false. Hicks certainly argues that it does. And without that evidence, Hicks was left without much evidence at all. Thus, Hicks could not make her case about the ultimate fact without making her case about the ancillary fact, too. In other words, unless she could argue that the ALJ should have considered her medical evidence, regardless of the doctor who signed it, her benefits claim was doomed.

But, the so-whatters might continue, this case in not quite like those from the "tour." In those, the government made irrebuttable assertions about the ultimate fact at issue: He is a member of the Taliban. She lied on an employment form. That student is from out of state. Here, by contrast, the SSA held off on declaring Hicks unentitled to her disability benefits until it gave her a chance to rebut that ultimate fact. The only irrebuttable assertion it made was about a narrower, evidentiary issue.

14

Under the circumstances, however, that distinction makes little difference.  For Hicks, the ultimate and the evidentiary questions were largely the same, seeing as her right to social-security depended, largely, on the template form.  The first time through, that form was the basis for her claim.  The second time, it was the only evidence she could reasonably get her hands on.  To prove, in 2016, that she deserved benefits in 2007, she needed to use—or at least to argue that she should be able to use—her best evidence from that time.  If the ALJ had considered the form, Hicks might have kept her benefits.  If he did not, she would not.

When a right turns on a fact, due process demands the opportunity to establish or to dispute that fact.  *See Louisville & Nashville R.R. Co.*, 277 U.S. at 91.  Here, Hicks's rights turned on an evidentiary fact: whether or not her medical evidence was fraudulent, and, thus, worthy of being considered.  But the SSA never allowed Hicks to dispute the fact that her form was fraudulent or to establish that, fraudulence aside, it nevertheless had some data worth considering.  Rather, the government adopted, in somewhat Frankensteinian fashion, many procedural traits that the Supreme Court deemed unconstitutional in the above cases.  As in *Loudermill*, *Yamasaki*, and *Louisville & Nashville Railroad Co.*, the agency decided a material fact without any adversarial input.  As in *Vlandis*, that decision led to an irrebuttable evidentiary rule.  As in *Greene*, the agency never let Hicks see the basis for that decision.  And as in *Hamdi*, the agency never let Hicks challenge that basis.  This case, of course, has many differences from those.  But the similarities are what matter.  Those similarities drove the SSA to do what the Due Process Clause forbids:  Decide a fact without letting the person affected by that decision know, or challenge, the basis for it.

15

What else could the SSA insulate from dispute?  Currently, the answer seems to be: Anything the OIG says.  Whether true or false, if the OIG announces a "reason to believe" that part of an application is made-up, then forevermore that part will be known and treated as fraud—just as, after the Mobbs Declaration, Yaser Hamdi was known and treated as a terrorist.  The slope is a slippery one.

But it is also one that the Due Process Clause prevents the SSA from going down.  To summarize:  The OIG made a factual assertion about Hicks's application.  That assertion was crucial because it removed the only medical records Hicks could reasonably access, nearly ten years down the road.  To defend her benefits, therefore, Hicks needed a chance to challenge the assertion.  But she never got one.  Because she did not, her hearing was not meaningful.  And because her hearing was not meaningful, the redetermination process violated the Constitution.

## B.

The SSA responds in a number of ways.

## 1.

First, the SSA argues that it has already given Hicks all the process she could want. *See* R. 25 at 20.  Hicks got a hearing.  The point of that hearing was to determine whether she deserved her benefits.  To that point, she could have "testif[ied]," "submit[ted] any new evidence that is new [and] material," and "s[ought] assistance with developing records that are new [and] material." *Id*.  And if she wanted the ALJ to consider any other evidence, the SSA said at oral argument, it was her "responsibility" to present it.

16

Yes, Hicks got a hearing.  But she might as well have arrived in a DeLorean.[4]  It was a hearing about the past.  Like Marty McFly, the SSA had the power to change the past—specifically, to act as if Hicks had never submitted medical evidence from any of Conn's doctors, causing the main support for her claim to disappear.  Certainly, offering to help Hicks develop new evidence was generous.  But by that point, there was no going back. Even if Hicks had been to another doctor in 2007, that doctor likely did not keep a record of the visit for ten years, and definitely would not remember the visit now.  And even if Hicks had such records and had given them to Conn, his bookkeeping apparently left much to be desired.  R. 22 at 20.  Indeed, if what the government says is true, then Conn was a fraudster, and fraudsters try not to leave paper trails.  Conn's clients were his victims, too:  They could bring him a legitimate claim, and all they would get was a form.  Hicks's benefits claim, therefore, could live or die on the form.  Hicks was indeed "responsible," under the statutes, to re-prove her entitlement during the redetermination hearing.  But she is not "responsible" for what Conn supposedly did to the SSA, and to her.  The SSA must give her a chance to fulfill her responsibility—not cut the branches off the tree and then tell her to climb it.

So, yes, Hicks got a hearing, but not a "fair opportunity" to present her case.  *Hamdi*, 542 U.S. at 533.  To see what such an opportunity might look like, look no further than at redetermination hearings for Conn's other clients.  In some cases, Conn's doctors had also evaluated the clients on behalf of the SSA.  And during the redetermination hearings, as the SSA conceded during oral argument, the SSA considered reports from those doctors—the

---

[4] *See generally Back to the Future* (Universal Pictures 1985) ("Marty:  Wait a minute.  Wait a minute.  Doc, uh . . . Are you telling me you built a time machine . . . out of a DeLorean?  Doc:  The way I see it, if you're gonna build a time machine into a car, why not do it with some style?").

*very same* doctors whose reports it excluded when they supported the claimants.  *See* R. 28 (collecting examples).  Recreating the past is difficult.  If the SSA wanted Hicks to recreate the past, it should have given her the same opportunities it gave itself.

2.

Second, the SSA argues that it does not have permission to give Hicks more process. R. 25 at 32.  According to the SSA, it merely followed Congress's orders.  And those orders were to "disregard any evidence" when the SSA has "reason to believe" that the evidence is fraudulent.  42 U.S.C. § 405(u)(1)(B).

Excluding fraudulent evidence is one thing.  Forming a reason to believe that the evidence is in fact fraudulent, however, is another.  Although the statute demands the former, it says nothing of the latter.  Congress's intent on that score is, therefore, open to interpretation.  As discussed above, the SSA's interpretation would make the redetermination statute unconstitutional.  That then is one interpretation that the Court must avoid.  *See* Antonin Scalia & Bryan Garner, *Reading Law: The Interpretation of Legal Texts* 247 (2012) ("A statute should be interpreted in a way that avoids placing its constitutionality in doubt." (citing *U.S. ex rel. Att'y Gen. v. Del. & Hudson Co.*, 213 U.S. 366, 408 (1909))).

As the SSA concedes, courts must presume that Congress follows the Constitution. *See* R. 25 at 32.  The Constitution includes a due-process clause.  That clause guarantees Hicks a chance to challenge factual assertions that affect her rights, like the OIG's assertion about her principal medical evidence.  Thus, the redetermination statute must honor that guarantee and leave the SSA room to provide beneficiaries the process they are due.

18

3.

Third, the SSA argues that its interpretation of the statute should control, regardless of what the Court thinks. R. 25 at 17. Under *Chevron*, courts defer to an agency's reasonable interpretation of an ambiguous statute, at least when the agency codifies that interpretation in a binding regulation. *Chevron v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984).[5] The redetermination statute is, indeed, ambiguous—Strunk and White would have had fits over a passive phrase like "there is reason to believe that fraud . . . was involved in the application of an individual for such benefits." 42 U.S.C. § 405(u)(1)(A).

No doubt, the SSA has endeavored to interpret and apply the redetermination statute reasonably. For the most part, it has succeeded. But location is key. The interpretation at issue—that the OIG's assertion is not open to challenge—resides only in the HALLEX manual and a later policy statement. "[I]nterpretations contained in *policy statements*, *agency manuals*, and enforcement guidelines" have not gone through the notice-and-comment process, and thus "lack the force of law." *Christensen v. Harris Cty.*, 529 U.S. 576, 587 (2000) (emphasis added). Those interpretations warrant "respect," but not "*Chevron*-style deference." *Id.* (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)). The manual and statement might have the power to persuade a court, but not to bind it. *Id.*

And no matter how much power those materials have to persuade, the Court must still follow the Constitution. A court can defer all it wants, but, in the end, it cannot adopt an unconstitutional interpretation. *See, e.g.*, *Stinson v. United States*, 508 U.S. 36, 45 (1993)

---

[5] *But see* Charles J. Cooper, *Confronting the Administrative State*, 25 Nat'l Affs. 96, 102–04 (2015) ("[O]ur constitutional order has been subverted, perhaps irreversibly . . . the administrative state has the last word, binding even on the Supreme Court, on what ambiguous statutory provisions mean[.]").

("[P]rovided an agency's interpretation of its own regulations *does not violate the Constitution . . .* it must be given [deference]." (emphasis added)).

4.

Fourth, the SSA argues that Hicks has no right to additional process.  R. 25 at 13.  True, "due process does not require an automatic right to challenge every SSA evidentiary decision," all the above case law notwithstanding.  *Id.*  But under that case law, due process does require some opportunity to challenge decisions about facts that affect people's rights.  *See, e.g.*, *Hamdi*, 542 U.S. at 533.

The principal case on which the SSA relies—*Flatford*—simply applies that rule.  In *Flatford*, the Sixth Circuit held that the SSA need not allow a disability recipient to cross-examine experts who submit reports after his hearing.  *Flatford v. Charter*, 93 F.3d 1296, 1307 (6th Cir. 1996).  But there, the SSA had already given him a meaningful hearing, complete with an "opportunity to present *all of his evidence* and to confront the evidence against him."  *Id.* at 1306 (emphasis added).  *Flatford* simply limits the number of times that someone may meaningfully prove her case.  Hicks would like the opportunity to do so once.  And she is entitled to.  More specifically, she is entitled to challenge the SSA's unilateral evidentiary decision and to argue why the SSA should allow her to present the evidence that she wishes to present.[6]

---

[6] The SSA mentions three other cases, none persuasive here.  *Yancey*, which the SSA cites as a Sixth Circuit case but is actually from the Second Circuit, merely adopts *Flatford*.  *See Yancey v. Apfel*, 145 F.3d 106, 113 (2d Cir. 1998).  *Mancari*, a decision from the Northern District of Illinois currently on appeal, simply applies the *Mathews* rule that disability beneficiaries are entitled only to meaningful post-termination hearings.  *Mancari v. Colvin*, No. 15 C 1105, 2016 WL 3951415, at *4–5 (N.D. Ill. July 21, 2016).  And *Kaley*, a Supreme Court case, is unique to defendants who want to challenge grand-jury findings.  *See Kaley v. United States*, 134 S. Ct. 1090, 1103 (2014).

5.

Fifth, the SSA argues that Hicks has no right to the specific type of additional process she seeks.  *See* R. 25 at 29–30.  As the SSA pointed out at oral argument, Hicks's hearing was not a criminal trial.  The OIG never found that Hicks herself had committed the fraud—it only asserted a "reason to believe" that her lawyer had done so, which compelled the SSA only to redetermine her right to benefits.  The OIG's assertion, says the SSA, merely initiated a process; it was not a "finding" that had anything to do with Hicks, who has no need—or right—to challenge the immaterial.

How Orwellian.  Although the OIG never said Hicks put the fraud in her application, it did believe that there was fraud in her application—and it said so.  Maybe the OIG did not mean for that statement to be taken as a fact, but the SSA took it as one anyway.  We cannot look at fraud, the SSA has consistently argued, and the OIG thinks this is fraud; thus, we cannot look at it.  If the OIG's assertion was not a "finding," it sure acted like one.  And that finding had everything to do with Hicks—indeed, her "rights depended upon" it.  *Louisville & Nashville R.R. Co.*, 277 U.S. at 91.  Because the ALJ could no longer look at the evidence earmarked as "fraud," Hicks had no chance of retaining her benefits.

As the SSA would have it, however, agencies could evade due process with indirect phrasing.  And worse still, beneficiaries could get better hearings by committing the fraud themselves.  If the government said, "Hicks defrauded," she could challenge that assertion.  But if the government said, "fraud was involved in her case," she could not.  Such is the danger of the passive voice.

This case would be different if Hicks merely wanted to challenge the government's allegations against Conn. Those allegations indeed have little to do with her—Hicks was just one-one-thousand-seven-hundred-and-eighty-seventh of a piece of his alleged scheme. But she does not want to clear Conn's name. At the end of the day, the name on her application was not Eric Conn, but Amy Jo Hicks. Saying that her application contains fraud necessarily implicates her, too. She simply wants to challenge that alleged "fact," which the SSA relied upon when it redetermined, and ultimately revoked, her disability benefits. Due process affords her that opportunity.

6.

Finally, the SSA argues that additional process would be too expensive—and thus, that it gave Hicks enough process, all things considered. R. 25 at 23–32. This good-enough argument relies on the so-called *Mathews* test, which courts normally use to measure how much process is due, and which this Court has avoided using until now. When the naked eye can see that process falls short of the mark, courts need no measuring tape.

In any event, the tape confirms what the eye can see. Under *Mathews*, the Court must consider (1) the private interest at stake, (2) the risk that the government might erroneously deprive someone of that interest, and (3) the government's interest in providing a particular level of process. *See Mathews*, 424 U.S. at 335.[7]

---

[7] The Court applies the *Mathews* test while at the same time recognizing that it has lived under substantial—and persuasive—criticism, almost since the day that the Supreme Court created it. *See generally* Jerry L. Mashaw, *The Supreme Court's Due Process Calculus for Administrative Adjudication: Three Factors in Search of a Theory of Value*, 44 U. Chi. L. Rev. 28 (1976). This case exemplifies one of the test's many problems. Nowhere does the test allow the Court to weigh the plain old value of process itself, *i.e.*, of simply knowing why the government has decided to take action against you. And part of what Hicks seeks is simply a chance to know. In a democracy, that interest is significant. *See id.* at 45 ("[Government action] can be legitimized only by invoking either authority or

a.

First, does Hicks have a significant interest at stake? Yes. Courts "have frequently recognized the severity of depriving a person of the means of livelihood." *Loudermill*, 470 U.S. at 543. For Hicks, those means were her disability payments, without which she is, apparently, destitute. The SSA does not seriously contest that Hicks has an interest in her disability payments. *See* R. 25 at 31. But it does contest the nature, significance, and scope of that interest.

As to nature, the SSA argues that Hicks has an interest only "in having a meaningful opportunity to show" that she deserved benefits at the time she applied for them. R. 25 at 20. That argument misreads *Mathews*, where the Court was clear that "interest" means a liberty or property interest, and that social-security benefits count as a property interest. 424 U.S. at 332. All the same, the misreading does not help the SSA much. Hicks never got her "meaningful opportunity."

As to significance, the SSA argues that, as a disability recipient, Hicks does not enjoy the same "heightened" interest as welfare recipients do under *Goldberg*. R. 25 at 31. That may be. Under *Goldberg* and *Mathews*, however, welfare and disability recipients alike get a meaningful hearing. Hicks, still, has not.

Also as to significance, the SSA argues that Hicks's interest has got nothing on the "unassailable principle that individuals should not receive benefits" they do not deserve.

---

consent. In a democracy consent is undoubtedly the preferable justification. Its procedural approximation would seem to be the fullest possible participation in the decisional process."). As scholars have argued more recently, *Mathews* is better understood not as a rigid algorithm, but as a framework for crafting fair procedures. *See generally* Gary Lawson et al., *"Oh Lord, Please Don't Let Me Be Misunderstood!": Rediscovering the* Mathews v. Eldridge *and* Penn Central *Frameworks*, 81 Notre Dame L. Rev. 1 (2005).

R. 25 at 20.  The SSA is absolutely correct on this point.  Equally unassailable, however, is the principle that the government should not take people's things without giving them due process.  Whether or not the government thinks she should, Hicks has an interest in keeping what has, until recently, been hers.

And as to scope, the SSA argues that Hicks has no interest in a better redetermination process because she has other ways to get her benefits back—like filing a new application or asking the SSA to forego reclaiming her past payments.  R. 30 at 8.  For someone in Hicks's position, however, filing an entirely new application or defending past payments is itself a burden.  And the hope of recovering her benefits someday, of course, does not help her now.  Hence why agencies must provide due process the first time around.

Granted, under *Mathews*, an agency may wait to give someone a hearing until after terminating her disability benefits.  But *Mathews* must be understood in context.  And in that context, the plaintiff eventually got a meaningful hearing, including the opportunity "to challenge directly the accuracy of [the] information" the government had used against him.  424 U.S. at 349.  Here, the SSA's additional remedies do not provide such an opportunity.  At no point can Hicks challenge the assertion that her medical evidence was fraudulent; at no point can she resuscitate her (potentially) most persuasive evidence.  Without that evidence, any new application or waiver request she submits might well turn up dead on arrival.  Thus, the SSA's additional remedies are no substitute for a meaningful hearing.  They would merely put Hicks through another costly round process, still without letting her challenge the OIG's assertion.

The point is, property comes with process.  Owning a house does not just provide shelter, stability, and a school district, but also a guarantee that the government will not take the house without just compensation.  When that property is social security, the rule remains the same:  Those who are entitled to receive benefits are also entitled not to have them taken without due process.  *Loudermill*, 470 U.S. at 541 ("[T]he Due Process Clause provides that certain substantive rights—life, liberty, and property—cannot be deprived except pursuant to constitutionally adequate procedures.").  Hicks has an interest in receiving her benefits and in keeping them.  The Constitution therefore required the SSA to give her a meaningful hearing if it wanted to take her property.  Instead, she had to defend herself with one hand tied behind her back.  The SSA's additional remedies do not free that hand.  They therefore cannot make Hicks whole again, because they cannot restore her interest in having a full and fair opportunity to defend her claims.  Thus, Hicks's interest does not shrink in their light.

### b.

Second, is there a risk that the SSA erroneously deprived Hicks of her interest?  Yes.  If the OIG was wrong that Hicks's medical form was fraudulent, then the ALJ was wrong to exclude that evidence.  And if the ALJ wrongly excluded evidence, then the SSA might have wrongly terminated Hicks's benefits.

And the OIG might well have been wrong that Hicks's medical form was fraudulent.  This case could be different if the OIG had asserted something objective and easy to verify about Hicks—as in, "She has been indicted before."  *See Gilbert v. Homar*, 520 U.S. 924, 934 (1997).  But the OIG asserted something more "subjective"—that Hick's application contained a lie.  *Loudermill*, 470 U.S. at 544 n.9.  Did it?  Maybe, maybe not.  Truth usually

25

depends on context.  "Those pinstripes look very slimming on you."  The truth, or a lie?
That depends on the girth of the person wearing the suit.  Without context, one cannot know.

Likewise, without context—and without even the "discretion" to consider the
context—an ALJ cannot know whether Hicks's application really contained a lie.  HALLEX
§ I-1-3-25(C)(4)(a).  Maybe the template medical form happens to be accurate as to her.
Maybe one of Conn's doctors really did examine her.  When an issue "is inherently subject
to factual determination and adversarial input" in this way, due process guarantees a chance
to share one's own side of the story.  *Yamasaki*, 442 U.S. at 696–67.  But the redetermination
process offers no relief—even on appeal—for the preclusive effect of the OIG's assertion.
The OIG identified 1,787 applications.  The SSA acted on all of those applications in less
than a week.  And if they made an error, there is no way to catch it.

The SSA responds that, even if the template form is true for Hicks, she would be "the
needle in the haystack."  R. 25 at 27.  To be sure, if providing more process would help only
the "rare exceptions," the second *Mathews* factor weighs against providing more process.
*Mathews*, 424 U.S. at 344.[8]  But here, there is no way to know how many "needles" there
are.  The OIG's fraud assertion is unreviewable.  When all is said and done, the OIG might
have been one-hundred percent right about all 1,787 applications.  Or, it might have been
ninety-nine percent right.  Or ninety.  Or eighty.  And so on.  The point being that, unless the

---

[8]  This is yet another problem with *Mathews*:  It sets the wrong baseline.  Extending the logic of the second prong,
all process is, potentially, up for sale.  But due process includes certain features that cannot get bargained away.
That principle should be the starting point—and if a party wants any *additional* process, then *Mathews* can apply.
Otherwise, the government could simply remove fundamental procedures—like the one it denied Hicks—just
because they might be costly or ineffectual in a particular line of cases.  And otherwise—applying the same logic to
a different branch—courts could simply throw away all the pro se habeas petitions they receive, including, for
example, Clarence Gideon's.  *See Gideon v. Wainwright*, 372 U.S. 335 (1963).

Court considers the OIG infallible, it cannot be sure that Hicks is only a needle in the hay, instead of a needle in a stack of needles. And this Court is not prepared—or allowed—to call any governmental agency infallible.

The question, then, is not whether Hicks will win her benefits back. *See Loudermill*, 470 U.S. at 544 ("[T]he right to a hearing does not depend on a demonstration of certain success."). The question is whether the SSA relied on a "factual determination" when it removed those benefits. *Yamasaki*, 442 U.S. at 696–97. It did: The SSA decided not to consider certain evidence that was, according to the OIG, fraudulent. But since the SSA took no "adversarial input" on that fact, the determination could have been wrong, thus increasing the risk that the SSA incorrectly excluded certain evidence and deprived Hicks of her benefits based on an incomplete record. *Id*. Indeed, in *Yamasaki*, the Supreme Court held that "fault" is the type of fact that requires an adversarial hearing to establish: Evaluating fault "usually requires" assessing a person's "credibility," "intelligence," "physical and mental condition," and "good faith." *Id*. Cutting out that step, therefore, might lead to faulty decisions. And in the redetermination statute, fault is listed *right beside* fraud as a reason for redetermining an application. *See* 42 U.S.C. § 405(u)(1)(A) ("The [SSA] shall immediately redetermine the entitlement . . . if there is reason to believe that fraud or similar fault was involved."). If one requires input from both sides, the other does, too.

Moreover, a redetermination hearing is not just a hunt for needles in the hay. In the hearing, ALJs must assess whether "there is []sufficient evidence to support" an application. *Id*. § 405(u)(3). Even if she was no needle, Hicks might still have put the template form to good use. Maybe the form includes some true information, even if the rest is false. Maybe

27

the form bolsters Hicks's other evidence.   Or maybe the form is her *only* evidence—a possibility that, for many Conn clients, is more than just a hypothetical.  *See* R. 22 at 20.

In short, the "probable value" of an "additional procedural safeguard[]"—specifically, a chance to contest the OIG's fraud assertion—is high.  *Mathews*, 424 U.S. at 343.  Granted, the SSA takes some steps to reduce the risk of erroneous deprivations, most significantly by helping beneficiaries develop new evidence.  But as explained above, evidence from ten years later is often nothing compared to evidence from the moment.  Hicks's best evidence from the moment was the template form.  Maybe she could explain why an ALJ should consider the form—in part, if not in whole.  Maybe an ALJ would agree, consider the form, and uphold her benefits.  Of course, maybe the SSA is right, too, and Hicks would still lose.  But *Mathews* does not talk about the probability of a victory; it talks about risk of an unfair loss.  *Id.* at 335.  Because Hicks never got a chance to make her case fully—and explain why her best evidence is worth considering—there is a risk that she was erroneously deprived.

### c.

Finally, does the SSA have a significant interest in denying additional process?  No.  The SSA argues that "administrative costs would soar" if it were to "conduct hundreds of mini-trials on the issue of fraud."  R. 25 at 25.  In general, costs are a legitimate concern.  *See Mathews*, 424 U.S. at 335.  And in this case, they would be a legitimate concern if what the SSA says is true.  But what the SSA says does not appear to be true.  As the SSA explained repeatedly at oral argument, Hicks does not stand accused of fraud.  Had the hearing gone as it should have, the question before the ALJ would have been a simple one:  Is the template form trustworthy?  ALJs make such evidentiary decisions for a living.

Far be it from this Court to tell them how to do so here.  But an adequate process might look something like this:  The SSA calls an OIG agent to the redetermination hearing.  The agent testifies about how he came to believe that there was fraud in part of Hicks's file.  Hicks cross-examines the agent and presents evidence to show why her forms were all true.  After this exchange, the ALJ can decide for herself whether to consider the template form, and, if so, how much weight to give it.  No mini-trial necessary.  In fact, this process would look much like a Rule 5.1 preliminary hearing in a criminal case.  *See* Fed. R. Crim. P. 5.1.  Those are quick, informal, and give the parties a way to test adversarially the government's finding of probable cause, which is much like the OIG's finding of a "reason to believe."

Granted, such a hearing will take a little longer than the one Hicks got.  But that "burden," if it is one, is not heavy enough to tip the *Mathews* scales.  Indeed, this is the very process that the SSA provides in cases where the SSA—rather than the OIG—is the one to discover the fraud.  In that case, an ALJ may consider evidence allegedly tainted by fraud.  At least, the beneficiary can object "to the disregarding of certain evidence," and the ALJ can hear the objection.  HALLEX § I-1-3-25(C)(4)(b).  If the ALJ "is satisfied" that the evidence is not fraudulent, "he or she will consider the evidence."  *Id.*  The SSA has offered no reason why the process becomes any more costly when the OIG gets involved.

Aside from costs, the SSA argues that legislative history and public policy compel the Court to bless the SSA's procedural choice.  As the legislative history reflects, Congress was interested in cutting undeserving beneficiaries off the government's payrolls, and fast.  *See* R. 25 at 24–25 (discussing 140 Cong. Rec. H4750-03).  But when Congress confers property interests—like social-security benefits—it may not force beneficiaries to take the

"bitter with the sweet," *i.e.*, trade in due process for a disability payment. *Loudermill*, 470 U.S. at 541.

Should Congress choose to scrap the program altogether, nothing in the Constitution would stop it. As long as it chooses to provide social-security benefits, however, Congress must pair those benefits with due process. As discussed earlier, due process entails the right to challenge the OIG's fraud determination, a right that this Court assumes Congress meant to preserve. And as discussed here, that right is not such a large wrench that it will slow the redetermination process down much, if at all. Congress certainly has a legitimate interest in "assuring a fiscally responsible system." *Himmler v. Califano*, 611 F.2d 137, 146–47 (6th Cir. 1979). But that interest leaves room—as it must—for another: Hicks's interest in exercising her constitutional rights.

As for policy, the SSA offers two arguments. First, it contends that allowing Hicks to challenge the fraud assertion would require opening the "OIG's investigative file" on Conn's thousands of clients, "severely prejudicing the [g]overnment's ability to prosecute" Conn. R. 25 at 27. Why Hicks would need information on thousands of people, in a hearing about just one, is unclear. Regardless, the government only began to prosecute Conn a year after it began to redetermine the rights of his victims. It cannot use that delay for its own benefit now—especially since the redetermination statute itself provides a clear way to safeguard information related to a prosecution, which the government, apparently, chose not to follow. *See* 42 U.S.C. § 405(u)(1)(A) (allowing a prosecutor to halt the redetermination process).

Second, the SSA argues that allowing Hicks to challenge the fraud assertion might cause the "fundamentally unfair" result that she keeps her benefits while others do not. *Id.* at

26. Indeed—that is how hearings work.  Some claimants will win, some claimants will lose. And if the hearings are meaningful, those who deserve to win will separate themselves from those who deserve to lose.  What the SSA calls unfair, the Constitution calls due process.

d.

Bringing it all together:  The SSA has deprived Hicks of a property interest.  Because the SSA forbade Hicks from so much as mentioning the template forms, the SSA might have deprived her erroneously.  And the SSA fails to identify any governmental interests that an "additional"—not to mention constitutionally required—"safeguard" would upset.  *Mathews*, 424 U.S. at 348.  Thus, under either the rigid due-process rule that the Court applied earlier, or the more flexible standard it applies here, the redetermination process is unconstitutional.[9]

III.

Under 42 U.S.C. § 405(g), the Court can affirm, modify, or reverse an SSA decision "with or without remanding the cause for a rehearing."  A rehearing is appropriate here. Because of its unconstitutional internal guidelines, the SSA did not consider all the evidence it should have.  Hence, the Court cannot know if the SSA's decision was right or wrong. Depending on whether the ALJ ultimately considers the template form—and how much weight he thinks it deserves—Hicks might or might not have sufficient evidence to warrant benefits.  Rather than guess at the facts, the Court will give the professionals a chance to determine them.

---

[9]  The Court is aware that two judges from this district have reached the opposite conclusion.  *See Carter v. Colvin*, No. 0:16-cv-00017-DCR, D.E. 24 (E.D. Ky. Oct. 6, 2016); *Griffith v. Colvin*, No. 7:16-cv-00101-DCR, D.E. 34 (E.D. Ky. Oct. 6, 2016); *Perkins v. Colvin*, No. 7:16-cv-00035-JMH, D.E. 46 (E.D. Ky. Oct. 6, 2016).  Although thorough and thoughtful, those opinions do not change the Court's conclusion here.

31

Even though remand is the "most natural remedy," Hicks argues that the remedy is "not suitable" here and that the Court should reverse the redetermination decision outright. R. 22 at 18. Like a car with a "faulty transmission," "bent frame," and "blown head gasket," Hicks says, the whole process is unsalvageable. *Id.* But to be clear, the Court only considers one part of the redetermination process unconstitutional. That is the paragraph in the HALLEX manual providing, in relevant part: "[A]djudicators do not have discretion to reconsider the issue of whether the identified evidence should be disregarded when based on an OIG referral of information or a referral based on information obtained during a criminal or other law enforcement investigation." HALLEX § I-1-3-25(C)(4)(a). To resolve the due-process problem on remand, therefore, the ALJ does not need to redo the entire hearing, but rather hold a supplemental hearing in which Hicks has an opportunity to discuss the evidence from the medical template form. If the ALJ believes that the evidence deserves some weight, then he must reconsider the redetermination decision—and if he does not, then he need not. The Court sees no reason to doubt that this simple fix will make the process "street legal."

Accordingly, it is **ORDERED** as follows:

(1)     Hicks's cross-motion for partial summary judgment on the due-process claim, R. 22, is **GRANTED**.

(2)     The SSA's cross-motion for summary judgment on the due-process claim, R. 25, is **DENIED**.

(3)     This case is **REMANDED** to the SSA for further proceedings consistent with

this opinion.

This the 12th day of October, 2016.

**Signed By:**

**_Amul R. Thapar_**

**United States District Judge**