UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
PIKEVILLE

| | |
|---|---|
| AMY JO HICKS,<br><br>    Plaintiff,<br><br>v.<br><br>CAROLYN W. COLVIN, *Acting Commissioner of Social Security*,<br><br>    Defendant. | Civil No. 16-154-ART<br><br>**MEMORANDUM OPINION AND ORDER** |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

"Just trust us: We're the government." That's not something you are supposed to hear every day. For good reasons, the Constitution limits the government's freedom to act simply on trust. One reason is that withholding this freedom from the government protects the freedom of its citizens. Alexander Hamilton, a founding father before he was a Broadway star, put the point this way: "To bereave a man of life . . . or by violence to confiscate his estate, without accusation or trial, would be so gross and notorious an act of despotism as must at once convey the alarm of tyranny throughout the whole nation." The Federalist No. 84, at 512 (Alexander Hamilton) (Clinton Rossiter ed., 1961) (quoting 1 William Blackstone, Commentaries *136; 4 *id*. at *438). Hence provisions like the Due Process Clause. The main point of that clause, to put it less eloquently than Hamilton would have, is that the government cannot do things to you without telling you why and without giving you a chance to speak for yourself.

Here, the Social Security Administration ("SSA") has asked the Court to trust it in two ways: First, to trust that it correctly cancelled Amy Jo Hicks's benefits without letting a judge consider all the evidence in the record; and second, to trust that it has correctly interpreted the Social Security Act to require this procedure. In its previous opinion, the Court declined both invitations. R. 36. It did so for two reasons, one rooted in the formal principles planted in the Due Process Clause, *see id.* at 7–16, the other in the Supreme Court's newer, more functional approach to due process, *see id.* at 22–31. The SSA now asks the Court to change its opinion. R. 39.

I. **Background**

For Amy Jo Hicks, it all started when the SSA's Inspector General ("OIG") found reason to believe that fraud was involved in Hicks's application for disability benefits. When the OIG discovers fraud, a statute requires the SSA to "immediately redetermine" whether someone deserves her benefits and to "disregard any evidence if there is reason to believe that fraud" was involved in producing that evidence. 42 U.S.C. §§ 405(u)(1)(A)–(B). As the SSA has interpreted that statute, the SSA "must disregard evidence" completely when the OIG (rather than the SSA itself) finds reason to believe that the evidence is fraudulent. *See Social Security Administration Hearings, Appeals, and Litigation Law Manual* ("HALLEX") § I-1-3-25(C)(4)(a). Thus, while redetermining her entitlements, the administrative law judge ("ALJ") excluded any evidence that Hicks had submitted from her lawyer, and alleged fraudster, Eric Conn or anyone associated with his alleged scam. Hicks could not challenge the exclusion; under the SSA's internal regulations, even the ALJ "d[id] not have discretion

2

to reconsider" whether that evidence should have been excluded. *Id*. When the OIG believes that a piece of evidence is fraudulent, that evidence becomes invisible.

Hicks sued, arguing among other things that the redetermination procedure violated her right to due process. R. 1 ¶ 14. The SSA responded that the Court should defer to its understanding of its statutory obligations; that the SSA already provided Hicks with so many procedural safeguards that one more would have been unnecessary; and that if the SSA had been wrong about Hicks, she was only the "needle in the haystack." R. 25 at 17, 20, 27. The Court disagreed. Due process does not permit trust; it demands a space for doubt. Or as the Court has put it: "When the government asserts a fact, and when that fact affects someone's right to life, liberty, or property, due process requires the government to let that person speak for himself." R. 36 at 12–13. And Hicks never got that chance.

In its Rule 59 motion, the SSA does not accuse the Court of misinterpreting the Due Process Clause. Actually, the SSA seems to agree that due process requires meaningful hearings and that those meaningful hearings must offer a chance to challenge the government's factual assertions. *See* R. 39 at 3–4. The SSA believes that the Court simply misapplied that principle in this case. In support, the SSA runs through—with great attention to detail—all the evidence that was already in Hicks's file for the ALJ to consider during her redetermination hearing. R. 39 at 6–11. With four hundred pages already before the ALJ, the SSA says, a few extra ones would not have made much difference. *Id.* at 11. After all, no one complains that novels are too short. If the Court had understood the context correctly, the SSA believes, the Court would have realized that Hicks has already received all the process she is due. *Id.* at 12.

Under Rule 59(e), a court must amend its opinion if it was premised on a "clear error of law." *GenCorp, Inc. v. Am. Int'l Underwriters*, 178 F.3d 804, 834 (6th Cir. 1999); *see* Fed. R. Civ. P. 59(e). The Court will therefore consider whether either ground for its opinion—*i.e.*, the formal meaning or the functional application of the Due Process Clause—was clearly erroneous.

## II. Ground one: The Due Process Clause

### a. The formal meaning of due process

The SSA's digest of the record provides helpful context. But context is not the point. The Court did not hold that the SSA's redetermination procedure—specifically the regulation that insulates the OIG's "reason to believe" finding from review—was unconstitutional only *as applied* to Hicks. The Court held that, as a result of the regulation, the redetermination procedure was *facially unconstitutional* under the Due Process Clause. R. 36 at 31 ("[T]he redetermination process is unconstitutional."); *id.* at 32 ("But to be clear, the Court only considers one part of the redetermination process unconstitutional. That is the paragraph in the HALLEX manual providing, in relevant part: '[A]djudicators do not have discretion to reconsider the issue of whether the identified evidence should be disregarded when based on an OIG referral of information or a referral based on information obtained during a criminal or other law enforcement investigation.'" (quoting HALLEX § I-1-3-25(C)(4)(a))).

But in case that disposition was unclear before, the Court is happy to clarify it now. Striking down a rule on its face is, of course, an "exceptional remedy," *Carey v. Wolnitzek*, 614 F.3d 189, 201 (6th Cir. 2010), and one that courts should use only if they can "leave nothing standing," *see Speet v. Schuette*, 726 F.3d 867, 872 (6th Cir. 2013) (quoting

*Connection Distrib. Co. v. Holder*, 557 F.3d 321, 335 (6th Cir. 2009) (en banc)).  One reason not to leave a regulation standing is if it violates the Constitution.  And as discussed here and in the Court's previous opinion, due process requires that people receive meaningful hearings before the government takes away their property for good.  *See Mathews v. Eldridge*, 424 U.S. 319, 339–40 (1976).  Although no two hearings are alike, all "meaningful" hearings give people an opportunity to rebut the government's assertions about facts that affect their rights.  *See* R. 36 at 9–16 (touring cases that establish and apply this rule).  An internal SSA regulation forecloses that opportunity.  As such, the regulation—and consequently the SSA's redetermination procedure—violates the Constitution.

This result is dictated by the formal meaning of due process.  Not to get too academic, but formalism is the basic idea that law is a science and that all one needs to practice that science is access to a law library.  *See* Christopher Columbus Langdell, Speech at the Quarter Millennial Celebration of Harvard University, *reprinted in* 3 Law Q. Rev. 123, 124 (1887) ("[T]he library is . . . to us all that the laboratories of the university are to the chemists and physicists, all that the museum of natural history is to the zoologists, all that the botanical garden is to the botanists.").  Rules have a definite shape that anyone—judges, lawyers, and average citizens alike—can discern if they just read the relevant cases, laws, and provisions.  And the textbook definition of due process is that a person deserves a "meaningful hearing" before the government takes something from her.  *See Armstrong v. Manzo*, 380 U.S. 545, 552 (1965); *see also* R. 36 at 9–16 (collecting cases).

The SSA complied with only half of that rule:  Hicks got a hearing.  Due process also required that hearing to be *meaningful*.  To be considered meaningful, a hearing must provide

a chance "to rebut the [g]overnment's factual assertions before a neutral decisionmaker." *Hamdi v. Rumsfeld*, 542 U.S. 507, 533 (2004). In this case, however, the government (here played by the OIG) asserted a fact: that some of Hicks's medical evidence was fraudulent. Hicks then got a hearing. But she never got a chance to rebut the OIG's factual assertion—the very assertion that started the whole process she now finds herself in. As such, her hearing was not meaningful and the redetermination procedure violated due process.

The SSA does not dispute that the excluded medical reports contained evidence that could have been favorable for Hicks if the ALJ had been allowed to consider it. But it does argue that, given the already hefty record on Hicks, the evidence was just not that important. R. 39 at 11. Thus, the SSA faults the Court for characterizing that evidence as important to Hicks's case. *See id*. at 5–6 (quoting the opinion).

Before she had that evidence, of course, Hicks's applications for disability payments all failed. *Id*. at 7–11. With that evidence, however, she succeeded. To be sure, one reason for that success might have been that her lawyer had rigged the game (allegedly, at least). But Hicks not only *got* benefits with that evidence in her file; she also *kept* her benefits with that evidence in her file. Although the SSA apparently continues to review whether someone still deserves benefits after it has awarded her those benefits, Hicks never lost hers until the SSA conducted the redetermination procedure at issue here. *See* 20 C.F.R. § 404.1590. The Court never said that Hicks will certainly win her benefits back when the ALJ considers the excluded evidence; in fact, it recognized that she very well might not. R. 36 at 28. That the evidence will be an important element of her case, however, seems hard to dispute.

Besides, the formal requirements of due process do not change from case to case. They apply to Hicks just the same as they apply to anyone else. To the extent the Court discussed the specific circumstances of *Hicks's* case, it did so because they help illustrate the larger principle at stake. Whether the excluded evidence really was fraudulent is a fact on which Hicks's property rights depended. *Mathews*, 424 U.S. at 332 (recognizing disability benefits as a property interest). With the evidence, she got benefits; without it, she lost them. The SSA obviously disagrees; its claim is, essentially, that four-hundred pages weigh more than nine, and the four hundred pages show that Hicks deserves no benefits. *See* R. 39 at 2. But Hicks's right to a meaningful hearing "does not depend on" whether she can demonstrate "certain success" before the hearing ever takes place. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 544 (1984). Due process is not reserved for the clear winners. Everyone gets a meaningful hearing.

The SSA also responds that the OIG's fraud assertion was not the "direct cause" of Hicks's "loss of liberty or property." R. 39 at 3. The Court has recognized—and continues to recognize—this fact. *See* R. 36 at 14–15. This fact distinguishes this case from cases like *Hamdi*, on which the Court has relied. There, the "fact" that Yaser Hamdi was an enemy combatant led directly to his military detention. *See* 542 U.S. at 510–11. Here, the "fact" that Hicks's application contained fraud led merely to a process by which she eventually lost her benefits. But when the government makes a factual assertion that leads to an outcome, the proximity of the assertion to the outcome does not matter: Due process affords the target of that assertion an opportunity to rebut it before a neutral decision maker. That similarity between Hicks and Hamdi matters, at least here, more than their differences. Again, specific

7

facts merely help illustrate the larger point. Because the OIG's fraud assertion was not open to question, Hicks could not defend herself with all the favorable evidence in her arsenal; she could not even challenge the factual assertion that put her benefits at risk in the first place. That assertion affected her rights. She had a due-process right to challenge it.

Plus, if the specific facts of this case get in the way of understanding the general rule, just remove Hicks altogether. For any SSA beneficiary, redetermination will work like this: If "there is reason to believe" that fraud exists in her application, the SSA will reassess her entitlements. 42 U.S.C. § 405(u)(1)(A). If the OIG found the "reason to believe," then any evidence the OIG flags as possibly fraudulent will effectively vanish from the person's file. HALLEX § I-3-25(C)(4)(a). Thus, when the OIG has a reason to believe that evidence is fraudulent—no matter what the reason is, no matter how sure the OIG is about that reason—for all intents and purposes that evidence is, in fact, fraudulent. That fact is inherently important to the process. No matter who she is, the person will have received her benefits based on all the evidence in her application. And it is indisputably hard to find new evidence to prove health conditions from years ago. Take out a piece of the original application and re-proving one's case becomes that much harder. Even without Hicks in the foreground, therefore, the picture remains the same: The OIG's factual assertion affects the rights of the beneficiary. She has a due-process right to challenge that assertion.

In the Star Chamber, secretive accusations often determined the outcomes of cases. Like mulch in a garden, the Fifth Amendment stifles such unfair practices before they can take root. *See Pennsylvania v. Muniz*, 496 U.S. 582, 595–97 (1990). Unquestionably, the SSA already does a lot to make sure that its beneficiaries get fair redetermination hearings.

Because the OIG's fraud assertion is totally unreviewable, however, the redetermination procedure—as the SSA currently models it—comes too close to a Star Chamber for comfort. This Court therefore was obligated, and remains obligated, to strike it down on its face.

### b. Deference to unconstitutional regulations

The second kind of trust the SSA has asked from the Court is trust in the agency's interpretation of the Social Security Act. One can understand why an agency would expert such faith: Over time, courts have come to trust the administrative branch more and more. Rather than "trust," of course, we call it "deference." When agencies interpret an ambiguous statute, courts generally must defer. *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984). When agencies interpret their own regulations, courts almost always must defer. *Auer v. Robbins*, 519 U.S. 452, 461 (1997). Agencies now can determine their own jurisdiction, *i.e.*, whether they even have the authority to interpret a statute in the first place. *City of Arlington v. FCC*, 133 S. Ct. 1863, 1868 (2013). And an agency's reading of a statute can now overturn a *court's* interpretation of that statute. *Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980 (2005).

For good reason, jurists have begun to ask whether this state of affairs violates the separation of powers. *See, e.g.*, *Perez v. Mortgage Bankers Ass'n*, 135 S. Ct. 1199, 1215–17 (2015) (Thomas, J., concurring in the judgment); *Gutierrez-Brizuela v. Lynch*, 834 F.3d 1142, 1149 (10th Cir. 2016) (Gorsuch, J., concurring). After all, as long as *Marbury* is still on the books, it is still the judiciary's job "to say what the law is." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803).

Indeed, deference is especially problematic when due process is involved. The Due Process Clause reaches back to Magna Carta, making it "[b]y far the oldest of our civil rights." Edward L. Rubin, *Due Process and the Administrative State*, 72 Cal. L. Rev. 1044, 1044 (1984). Magna Carta provided that "[n]o freeman shall be taken, or imprisoned, or be disseized of his freehold, or liberties, or free customs, or be outlawed, or exiled, or any otherwise destroyed; nor will we not pass upon him, nor condemn him, but by lawful judgment of his peers or by the law of the land." *See* 1 Edward Coke, *The Second Part of the Institutes of the Laws of England* 45 (1797). Jurists are rightfully growing wary of deferring to agencies, and they should squint especially hard at agency decisions that seem to curtail this guarantee that is so necessary to our concept of liberty. *See* Nathan S. Chapman & Michal W. McConnell, *Due Process as Separation of Powers*, 121 Yale L.J. 1672, 1782–90 (2012) (discussing due process as a limitation on executive authority); *see also* Rebecca L. Brown, *Separated Powers and Ordered Liberty*, 139 U. Pa. L. Rev. 1513, 1538 (1991) ("The Framers' recent experience [with monarchy] taught them that abandonment of separated powers led directly to the loss of accountable, impartial government, which, in turn, led inevitably to the loss of due process and individual rights.").

From one angle, the SSA's redetermination process is not the most egregious use of executive authority imaginable. The SSA gave Hicks a hearing before she lost her benefits, which, for disability recipients at least, the law does not require. *See Mathews*, 424 U.S. at 339–40. But from another angle, this case shows just how far deference has come. The SSA has argued that no one—not Hicks, not the Court, not even the SSA's own judges—needs a chance to review the OIG's decision *at all*. And even though the applicable statutes do not

require such an insulated process, the SSA has argued that the Court need not trouble itself with reading them: As far as the Court needs to be concerned, those statutes say whatever the SSA believes they say.

Although courts increasingly tend to defer to agencies on many issues, they have not yet abdicated their responsibility to say what the Constitution means. The process Hicks received was not the process that, under the Constitution, she was due. The Court therefore cannot defer to the interpretation that birthed the process—the SSA's belief that the Social Security Act requires it to exclude evidence just because the OIG was the one who found a reason to believe that the evidence was the product of fraud. *See* R. 36 at 19–20.

### III. Ground two: *Mathews*

The second reason that the redetermination procedure violated due process was more functional. Under *Mathews*, courts need not look only (or ever) at the text and history of the Due Process Clause to know how much process someone deserves. Instead, courts are now measuring how much process is due by balancing: the private interest at stake, the risk that the government will erroneously deprive someone of that interest, and the government's interest in offering (or omitting) any given procedural safeguard. 424 U.S. at 335.

Though the SSA does not explicitly ask the Court to reconsider its *Mathews* analysis, the SSA's factual arguments implicate that part of the opinion, too. If the Court really was "manifestly incorrect" about the facts, to use the SSA's words, then the Court could not have balanced the *Mathews* factors correctly. R. 39 at 2.

To the extent that the SSA disagrees with how the Court applied *Mathews*, for two reasons that disagreement does not compel the Court to change its opinion. First, even

though courts apply *Mathews* in an array of contexts, that doctrine is actually built to address problems different in kind than the one the Court faces here. There, the plaintiff got his meaningful hearing. The problem was about what process he deserved around the edges; specifically, *when* did the hearing have to occur: before the SSA cancelled his benefits, or after? *Mathews*, 424 U.S. at 339–40. Since Hicks's hearing was itself not quite up to spec, whatever additional features the government might have included (or excluded) would have made no constitutional difference.

Indeed, the *Mathews* Court likely did not foresee the ubiquity that its holding now enjoys. Holdings apply to their facts; applying them beyond those facts creates law that the Supreme Court itself never intended to create. *See generally* Randy J. Kozel, *The Scope of Precedent*, 113 Mich. L. Rev. 179 (2014). In *Mathews*, the Court dealt with the timing of the hearing. This case deals with a core element of due process: the *content* of the hearing, *i.e.*, the ability to challenge the government's factual assertions. People sometimes deserve a hearing before their benefits are cancelled, and *Mathews* can help a court determine when they do. But whenever their hearings occur, people *always* deserve a chance to challenge the government's factual assertions. *Mathews* did not address—and did not change—this formal meaning of due process.[1] That formal meaning dictates this case; *Mathews* does not.

---

[1] *Mathews* did not consider whether the government violates due process by making decisions in a vacuum. And it would be improper to extrapolate a rule from *Mathews* that goes beyond its facts and particular holding. *See* Kozel, *supra* at 187-90. By doing so a court abandons its responsibility to deliberate and decide the specific question before it. *See* Pierre N. Leval, *Judging Under the Constitution, Dicta about Dicta*, 81 N.Y.U.L. Rev. 1249, 1250 (2006) ("We judges regularly undertake to promulgate law through utterance of dictum made to look like a holding--in disguise, so to speak. When we do so, we seek to exercise a lawmaking power that we do not rightfully possess. Also, we accept dictum uttered in a previous opinion as if it were binding law, which governs our subsequent adjudication. When we do so, we fail to discharge our responsibility to deliberate on and decide the question which needs to be decided.").

To put it simply, before the government takes someone's life, he must be able to challenge the allegations against him. Before the government takes someone's liberty, he must be able to challenge the allegations against him. And before the government takes a person's property, he must be able to challenge the allegations against him. So the core of due process is that before the government takes your life, liberty or property, you have to be able to know and challenge the substantive allegation against you. Whatever other process an agency chooses to provide to reduce its own error rate, it must provide this core element of due process. Thus, regardless of the facts that the SSA discusses, *Mathews* does not compel a different result in this case because Hicks did not receive this core element of due process.

Second, even were the Court to apply *Mathews*, the additional context that the SSA has provided does not tip the *Mathews* scales, because that context does not change the important facts. Taking the *Mathews* factors in order: First, Hicks's interest in keeping her benefits—without having to reapply for them unnecessarily—remains high. *See* R. 36 at 23–25. Second, the risk that the SSA erroneously cancelled those benefits is simply unknowable. *Id*. at 25–28. Part of the process—the OIG's fraud assertion—is insulated from review. Given that insulation, the Court cannot know whether the OIG was right about Hicks's medical evidence or whether the SSA was right to exclude it. All the Court knows is that, with the evidence, Hicks got (and kept) her benefits. Maybe the evidence would change the result; maybe not. But because Hicks's hearing was not meaningful, the Court cannot trust its result. Defective machines sometimes work, but are still defective. And finally, the SSA's interest in preventing Hicks from contesting the OIG's fraud assertion—a step that

would probably take very little time during her redetermination hearing—is relatively low. *Id*. 28–31.

Once more, the specifics of this case help illustrate the conclusion but do not dictate it. Pick any beneficiary you like: If the SSA decides to redetermine their entitlements, the procedure will look the same. Because that procedure will rely on an unchallengeable assertion of fact—an assertion that the SSA could let the beneficiary challenge at relatively low cost—that process will be facially unconstitutional under *Mathews*. *See United States v. Salerno*, 481 U.S. 739, 745 (1987) ("[In a] facial challenge . . . the challenger must establish that no set of circumstances exists under which the [law] would be valid.").

### IV.    Conclusion

In sum, the SSA has failed to demonstrate that the Court committed a clear error of law. Accordingly, it is **ORDERED** that the SSA's motion to alter or amend the Court's judgment, R. 39, is **DENIED**.

This the 21st day of December, 2016.

Signed By:
*Amul R. Thapar*  AT
United States District Judge